IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE

Assigned on Briefs October 16, 2019

**STATE OF TENNESSEE v. GEARY N. JACKSON, SR.**

**Appeal from the Criminal Court for Wilson County**
**No. 2018-CR-450    Brody N. Kane, Judge**

_____

**No. M2019-00180-CCA-R3-CD**

_____

Defendant, Geary N. Jackson, Sr., pled guilty to three counts of sale of oxymorphone, a Class C felony. Following a hearing, the trial court sentenced Defendant as a career offender to consecutive fifteen-year sentences. On appeal, Defendant asserts that his sentence is excessive and not in conformity with the purposes of the Sentencing Act. Upon review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROBERT L. HOLLOWAY, JR., J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and ROBERT H. MONTGOMERY, JR., JJ., joined.

Taylor M. Durrett, Lebanon, Tennessee, for the appellant, Geary N. Jackson, Sr.

Herbert H. Slatery III, Attorney General and Reporter; Ronald L. Coleman, Assistant Attorney General; Tom P. Thompson, Jr., District Attorney General; and Jason Lawson, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**Factual and Procedural Background**

In April 2018, the Wilson County Grand Jury indicted Defendant, in case number 2018-CR-450, for the following offenses:

| Count | Offense | Classification |
|---|---|---|
| 1 | Sale of oxymorphone, a Schedule II controlled substance | C felony |
| 2 | Sale of oxymorphone, a Schedule II controlled substance | C felony |
| 3 | Sale of oxymorphone, a Schedule II controlled substance | C felony |
| 4 | Sale of oxymorphone, a Schedule II controlled substance | C felony |
| 5 | Possession of oxymorphone, a Schedule II controlled substance, with intent to sell or deliver | C felony |
| 6 | Possession of .5 grams or more of cocaine with intent to sell or deliver | B felony |
| 7 | Possession of drug paraphernalia | A misdemeanor |
| 8 | Possession of a firearm during the commission of a dangerous felony | E felony |
| 9 | Possession of a firearm during the commission of a dangerous felony | E felony |
| 10 | Possession of a firearm during the commission of a dangerous felony | E felony |
| 11 | Possession of a firearm by a convicted felon | C felony |
| 12 | Possession of a firearm by a convicted felon | C felony |
| 13 | Possession of a firearm by a convicted felon | C felony |

### *Guilty Plea Submission Hearing*

Defendant entered open guilty pleas to Counts 1-3 and agreed that the trial court would determine his offender classification and the length, alignment, and manner of service of his sentences. In exchange for Defendant's guilty plea, the State agreed to enter a nolle prosequi in Counts 4-13. The State also agreed to dismiss Defendant's charges in Wilson County case numbers 2018-CR-1010; 2017-CR-644; and 2017-CR-889.[1]

---

[1] It appears from the record that these cases involved drugs and weapons offenses.

At the guilty plea submission hearing, the State presented the following factual basis for Defendant's plea:

[Defendant] is pleading guilty in three counts. The first count that he's pleading guilty to occurred on March 7th of 2017. On that day, a confidential informant working with the Lebanon Police Department told the agent that he knew that [Defendant] was selling [O]pana, that's the common name. The scientific name is oxymorphone, and that he could purchase [O]pana from [Defendant].

The informant met with the agents and was searched making sure that there were no drugs or money on his person. The informant then made a recorded call to [Defendant] in which [Defendant] told the informant to come over to [Defendant's] house to complete the purchase.

The informant was given a video camera and the informant then left the presence of the officers, although the informant was monitored by the officers as he went to [Defendant's] home. The officers saw the informant go into the house and at that time as they were conducting their surveillance they saw [Defendant] leave the residence and shortly thereafter return to the residence.

Once [Defendant] returned to the residence the informant left the residence and met back with the agents. The agents reviewed the video tape and on the video tape [Defendant] did accept the money from the informant. [Defendant] then went to get the pills. He returned to the residence and at that time [Defendant] did deliver the pills to the informant completing the purchase.

Once that was completed the informant then left and went and met with the agents and gave those pills to the agents. The agents sent those pills to the crime lab and it was in fact [O]pana that was purchased from [Defendant] that day. In reviewing the video you do clearly see [Defendant] on the video as part of this transaction.

The second sale occurred on February 23rd. On that day, the same informant who was still working with the Wilson County Lebanon Police Department Narcotics Unit said that he could again purchase from [Defendant]. They made a recorded phone call to [Defendant] and [Defendant] advised him to come to what [Defendant] knew as ["]the

shop.["]  This was the car detailing place that [Defendant] was in business at with his son, Travis Jackson.

The informant was given a video camera and the buy money.  The informant was also searched making sure that there were no drugs or money on his person.  The informant then left and went to the car detailing shop.  Once again on video, you can see [Defendant] meet with the informant.

The informant gives [Defendant] the money.  [Defendant] places the pills on the counter and then the informant picks up the pills.  Once that's completed the informant leaves and goes and meets back with the detectives.  The detectives were monitoring the operation as it transpired and were able to take surveillance photos of the persons coming to and from that car detailing shop.

The informant gave the pills that he had purchased from [Defendant] to the detectives and they sent those to the crime lab and the crime lab, also in this case, confirmed that it was oxymorphone or [O]pana.

The last sale that [Defendant] is pleading guilty to occurred on March 6th of 2017.  On that day there was a different informant who was working with the Lebanon Police Department.  This informant knew a person by the name of Travis Jackson, who is the son of [Defendant], and said that Travis Jackson was selling [O]pana pills.

The informant made a recorded phone call to Travis Jackson and Travis Jackson told the informant to come to [Defendant's] house.  The informant then went to [Defendant's] house.  The informant was given a video camera as well as the buy money after being searched and making sure that there [were] no drugs or money on his person.

The informant then, when they arrived at [Defendant's] house, the informant had a brief conversation with [Defendant] about the whereabouts of Travis Jackson.  Travis Jackson then comes out and gets in the car with the informant and there in the car there was a hand to hand exchange in which Mr. Travis Jackson gives the pills to the informant and the informant pays Travis Jackson.

The informant then goes to leave at that point in time to go and meet back with the detectives.  The detectives were in surveillance positions and

they would testify that they did observe Travis Jackson, once he left the vehicle to walk over to [Defendant's] and did hand [Defendant] the money from the sale.

That would be the proof that the State would put forward at a trial of this matter. On that third offense, the March 6th offense, the pills that were purchased from Travis Jackson were in fact sent to the crime lab and confirmed to be oxymorphone or [O]pana pills . . . .

### *Sentencing Hearing*

At a subsequent sentencing hearing, Julie Raines, a probation officer with the State of Tennessee Board of Probation and Parole, testified that she prepared Defendant's presentence report. Ms. Raines' stated that her investigation showed Defendant had a prior criminal record that consisted of eleven prior felony convictions and several misdemeanor convictions. Specifically, Defendant was previously convicted of the following: sale of oxymorphone, a Class C felony; possession of alprazolam with intent to sell or deliver, a Class D felony; three counts of sale of cocaine 0.5 grams or more, a Class B felony; possession of a weapon by a convicted felon, a Class E felony; three counts of sale of cocaine less than 0.5 grams, a Class C felony; and three counts of conspiracy to sell cocaine, a Class C felony. Ms. Raines testified that Defendant had three prior parole violations and a prior community corrections violation and that Defendant had previously participated in substance abuse programs while incarcerated. Ms. Raines explained that Defendant dropped out of high school in tenth grade and did not obtain a GED. Defendant, who was sixty-three years old, reported that he was not employed at the time of his arrest, and he provided no information about his work history other than to say that he "occasionally worked with his son detailing automobiles[.]" Defendant told Ms. Raines that he received disability benefits for "an ongoing heart condition[.]" Ms. Raines stated that she prepared a risk and needs assessment and found that Defendant was at a "high risk" to re-offend.

Detective Kenneth Powers with the Lebanon Police Department testified that the police department had conducted several controlled buys with Defendant. He explained that one of the controlled buys took place at J & J Auto Detailing—a business owned by one of Defendant's sons, Travis Jackson. Detective Powers stated that he learned from several individuals who were engaged in selling drugs with Defendant that the auto detailing business "was a complete total front[.]" He explained that police surveillance of the business revealed that the individuals working at the business were washing their own cars and that the auto detailing shop had no real customers. Detective Powers learned that three women—Falon Shelton, Jamie Spurling, and Katie Davenport—were drug distributors or "runners" for Defendant and Travis Jackson and that they were selling

prescription pills. Detective Powers testified that officers conducted several other controlled buys at Defendant's residence on Cleveland Street. Detective Powers stated that several search warrants were executed at the residence, resulting in the recovery of approximately thirty oxymorphone pills and several firearms. Detective Powers said that another of Defendant's sons, Geary Jackson, Jr., eventually pled guilty to possessing the firearms found in the residence.

Kody Mosby, Defendant's niece, testified that, when she moved to Tennessee in 2016, Defendant gave her a truck to use for work. She stated that Defendant also helped her with her three children, taking them to and from school when needed and attending school functions with them. Ms. Mosby explained that Defendant helped other family members and friends by paying their bills and taking care of their children. Ms. Mosby testified that Defendant had heart problems and that he had been admitted to the hospital three times. Ms. Mosby recalled that Defendant drove a delivery truck for a business for a while, but she did not know the name of the business.

Rachel Mayberry testified that she lived on the same street as Defendant. Ms. Mayberry stated that Defendant babysat her children, mowed her yard, and fixed the plumbing in her house "no questions asked, no money, no nothing." She stated that, on one occasion, Defendant paid for her daughter's medication. She said that Defendant had helped many people in their neighborhood in similar ways.

Defendant then made an allocution statement. He explained that he had "made mistakes in [his] life" but that he had "finally . . . seen the error of [his] ways[.]" Defendant said that he was willing to "make all the necessary corrections" to be a productive member of society "if given the opportunity of probation."

At the conclusion of the hearing, the trial court sentenced Defendant to fifteen years for each offense and ordered the sentences to be served consecutively. In determining Defendant's sentence, the trial court stated that it had considered:

> the evidence presented at the sentencing hearing, the presentence report, the principles of sentencing and arguments made as to the sentencing alternatives, the nature and characteristics of the criminal conduct that is involved, the evidence and information offered by the parties on mitigating and enhancing factors, and the statistical information provided by the AOC at their website, tncourts.gov/administration/judicialresources/ criminalsentencingstatistics, as well as the Defendant's statement of allocution and the Defendant's potential for rehabilitation or treatment.

The trial court found that Defendant was a career offender, explaining that Defendant stood convicted of three Class C felonies and that he had six prior Class C felony convictions. The trial court found that, because Defendant was a career offender, he should receive the maximum Range III sentence for a Class C felony, which was fifteen years. The trial court then ordered consecutive sentencing based on two discretionary consecutive sentencing factors—that Defendant was a professional criminal and that he had an extensive history of criminal activity—for an effective sentence of forty-five years in the Department of Correction. This timely appeal follows.

## Analysis

On appeal, Defendant contends that "his sentence was excessive under the sentencing guidelines and not in compliance with the stated purposes of the sentencing statute." Defendant asserts that his age, health, and "lack of prior access to probation and rehabilitation services all direct towards a lesser sentence." The State responds that the trial court properly exercised its discretion in sentencing Defendant. We agree with the State.

When the record establishes that the trial court imposed a sentence within the appropriate range that reflects a "proper application of the purposes and principles of our Sentencing Act," this court reviews the trial court's sentencing decision under an abuse of discretion standard with a presumption of reasonableness. *State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012). A finding of abuse of discretion "'reflects that the trial court's logic and reasoning was improper when viewed in light of the factual circumstances and relevant legal principles involved in a particular case.'" *State v. Shaffer*, 45 S.W.3d 553, 555 (Tenn. 2001) (quoting *State v. Moore*, 6 S.W.3d 235, 242 (Tenn. 1999)).

The Tennessee Supreme Court has held that the *Bise* standard applies to consecutive sentencing determinations "if [the trial court] has provided reasons on the record establishing at least one of the seven grounds" for discretionary consecutive sentencing. *State v. Pollard*, 432 S.W.3d 851, 861 (Tenn. 2013). A trial court "may order sentences to run consecutively" if it finds that the defendant is "a professional criminal who has knowingly devoted the defendant's life to criminal acts as a major source of livelihood" or is "an offender whose record of criminal activity is extensive." Tenn. Code Ann. § 40-35-115(b)(1)-(2) (2019).

In determining the proper sentence, the trial court must consider: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on the mitigating and enhancement factors set out in Tennessee Code

Annotated sections 40-35-113 and -114; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and (7) any statement the defendant made in the defendant's own behalf about sentencing. *See* Tenn. Code Ann. § 40-35-210 (2019); *State v. Taylor*, 63 S.W.3d 400, 411 (Tenn. Crim. App. 2001). The trial court must also consider the potential or lack of potential for rehabilitation or treatment of the defendant in determining the sentence alternative or length of a term to be imposed. Tenn. Code Ann. § 40-35-103 (2019).

To facilitate meaningful appellate review, the trial court must state on the record the factors it considered and the reasons for imposing the sentence chosen. Tenn. Code Ann. § 40-35-210(e) (2019); *Bise*, 380 S.W.3d at 706. The party challenging the sentence on appeal bears the burden of establishing that the sentence was improper. Tenn. Code Ann. § 40-35-401 (2019), Sentencing Comm'n Cmts.

In this case, the trial court considered the factors set out in section 40-35-210 and stated on the record the reasons for the sentence it imposed. Thus, the trial court's sentencing decisions are entitled to a presumption of reasonableness, and we will not reverse absent an abuse of discretion.

Although not expressly appealed by Defendant, we conclude as an initial matter that the trial court properly determined that Defendant is a career offender. As relevant here, "[a] career offender is a defendant who has received . . . [a]ny combination of six (6) or more Class A, B or C prior felony convictions, and the defendant's conviction offense is a Class A, B or C felony[.]" Tenn. Code Ann. § 40-35-108(a)(1) (2019). Defendant pled guilty to three counts of sale of oxymorphone, a Schedule II controlled substance, which is a Class C felony. Tenn. Code Ann. § 39-17-417(c)(2)(A). Moreover, the trial court's finding that Defendant had six prior Class C felony convictions is supported by the record. At the sentencing hearing, the State introduced Defendant's presentence report and certified judgments of conviction showing that Defendant was previously convicted of the following Class C felonies: one count of sale of oxymorphone; three counts of sale of cocaine less than 0.5 grams; and three counts of conspiracy to sell cocaine. Accordingly, Defendant is a career offender.

Based on Defendant's status as a career offender, the sentence for each of Defendant's convictions was statutorily mandated. Tennessee Code Annotated section 40-35-108 provides that career offenders "shall receive the maximum sentence within the applicable Range III." Tenn. Code Ann. § 40-35-108(c) (2019). Tennessee Code Annotated section 40-35-112 provides that a Range III sentence for Class C felonies is "not less than ten (10) nor more than fifteen (15) years." Tenn. Code Ann. § 40-35-

112(c)(3) (2019).  The trial court, therefore, properly imposed the statutorily mandated fifteen-year sentence for each of Defendant's convictions.

Further, the trial court properly exercised its discretion in ordering those sentences to be served consecutively.  The trial court found that there was "no doubt that [Defendant] is a professional criminal" who had "knowingly devoted his life to criminal acts as a major source of livelihood."  Tenn. Code Ann. § 40-35-115(b)(1) (2019).  The court further found that Defendant was "an offender whose record of criminal activity is extensive."  Tenn. Code Ann. § 40-35-115(b)(2) (2019).  These findings are fully supported by the record.  In addition to the three felony convictions in the instant case, Defendant had eleven prior felony convictions and several misdemeanor convictions.  Defendant's convictions span twenty-seven years, dating back to 1991, and most of his convictions relate to his selling of various controlled substances.  Ms. Raines testified that Defendant was not employed at the time of his arrest, and he reported no prior work history other than occasionally working at his son's auto detailing shop.  Detective Powers testified that Defendant's "work" at the auto detailing shop was a "front" for selling drugs.  Under these circumstances, the trial court properly exercised its discretion, and Defendant is not entitled to relief.

## Conclusion

For the aforementioned reasons, the judgments of the trial court are affirmed.

_____
ROBERT L. HOLLOWAY, JR., JUDGE